556 A.2d 1144
**SKI ROUNDTOP, INC.**
v.
**Mary E. WAGERMAN, et al.**
No. 1227, Sept. Term, 1988.
Court of Special Appeals of Maryland.
May 1, 1989.

Peyton Paul Phillips, Frederick, for appellant.

Harry T. DeMoll (Rosanne S. Effingham and Weinberg and Green, on the brief), Frederick, for appellees.

Argued before WILNER, ALPERT and ROBERT M. BELL, JJ.

ALPERT, Judge.

Ski Roundtop, Inc., appellant/cross-appellee (Ski Round-top), brought an action to quiet title in the Circuit Court for Frederick County against the surviving heirs of Charles and Mary Brawner (hereinafter collectively referred to as the "Brawners"), appellees/cross-appellants. The Brawners answered Ski Roundtop's complaint by asserting that they held record title to the property in question. Subsequently, they amended their answer by way of adding an affirmative defense, asserting that title vested in them by way of adverse possession.

Both parties moved for summary judgment. The trial court denied the Brawners' motion for summary judgment, but it granted partial summary judgment in favor of Ski Roundtop, declaring that a land patent for the subject property was not issued to Andrew Smith, the Brawners' original predecessor in title, and that Ski Roundtop possessed record title to six adjacent parcels of real property.

After a three-day non-jury trial, the trial court dismissed Ski Roundtop's action to quiet title. Further, the court declined to rule on the Brawners' adverse possession contention on the basis that the issue, raised by way of affirmative defense, should have been raised by way of counter-claim. Both parties filed post-judgment motions that were subsequently denied. Both parties noted timely appeals.

## FACTS

This dispute involves the ownership of a tract of land on a mountainside near Emmitsburg, Maryland. Ski Roundtop is the owner of six parcels of land that it contends encompasses the land in question. Four of these parcels of land are on the north side of the disputed realty, and their original title has been traced back to the original patent of a

tract of land referred to as "Carolina."[1] The remaining two parcels of land border the south side of the disputed realty and have evolved from an original land patent referred to as "Nigh Nicking," which itself was the northern tract of a parcel of land referred to in an even earlier patent called "Carricks Chance."

The Brawners contend that a vacancy, winsomely referred to as "Pleasant View," exists between the original patents of Carolina and Nigh Nicking. They contend that they are record title holders or, alternatively, owners by adverse possession of the land within this vacancy. Ski Roundtop contends that the southern boundary of Carolina and the northern boundary of Nigh Nicking are one and the same. The bulk of the evidence introduced at trial by way of testimony by surveyors, deed plottings, and surveys focused on the original surveys of these patents conducted nearly 200 years ago.

The key question at trial was the location of the intersection between the 90th line of the Carolina patent and the 8th line of a patent to the east of Carolina and Nigh Nicking, known as Black Walnut Bottom.[2] If the intersection occurred at the same spot where Nigh Nicking's 29th line intersected at Black Walnut Bottom, the Carolina line and the Nigh Nicking line were one and the same, not merely parallel. At trial, Ski Roundtop pointed to the fact that the patent for Nigh Nicking referred to the northern boundary of Carricks Chance as Nigh Nicking's 26th through 29th lines. A subsequent survey of Carolina called to the same boundary of Carricks Chance as Carolina's 87th through 90th lines. Thus, relying on this boundary call for the two patents, Ski Roundtop maintains that a common

---

**1.** The patent process was and is a method by which private persons become owners of land owned by the State. *See* Md.Real Prop.Code Ann., § 13–101 *et seq.*

**2.** The survey of the Carolina patent undertaken in 1795 was ambiguous in this regard as it did not call to the exact spot where the two lines intersected.

boundary line existed and, therefore, Pleasant View does not.

The Brawners counter that the proper method of plotting the 18th century surveys and, specifically, the 87th through 90th lines of Carolina is to plot, by way of the metes and bounds description in the original patent, the eastern boundary of Carolina from the 98th line, where it intersects Black Walnut Bottom at a known point, to determine where the 92nd line of Carolina (also the 11th line of Shield's Delight, a prior patent) intersects the 8th line of Black Walnut Bottom. Once this is determined, the length of the 91st line of Carolina running down part of the 8th line of Black Walnut Bottom can be plotted and this line's intersection with the 90th line of Carolina can be established. Utilizing this method, the Brawners' surveyor determined that the 90th line of Carolina intersected the 8th line of Black Walnut Bottom approximately 10 perches above where Nigh Nicking intersected said line. They contend that their survey indicates that the southern boundary of Carolina and the northern boundary of Nigh Nicking are merely parallel lines, and that a gap exists where Pleasant View is located. Such a survey method of reverse tracing eliminated an apparent foul where Black Walnut Bottom overlaps onto Shield's Delight on Ski Roundtop's survey. (For a view of the disputed lines see Appendix).

At the conclusion of the three-day trial, the trial court gave credence to the Brawners' evidence and determined that a gap between Carolina and Nigh Nicking patents existed. The court held that Ski Roundtop's record ownership of the six parcels of land did not include record ownership of the realty located in the gap. Having already held, on the motion for summary judgment, that Brawners' predecessor did not obtain a patent from the State for the disputed realty,[3] the court refused to address their adverse

---

3. The court never directly addressed the question as to whether the Brawners possessed valid record title to the property, but by its

possession claim on the basis that it was set forth as an affirmative defense, not as a counter-claim.

The following issues are presented:

## *Appeal*

   I.  Did the lower court err in ruling that there was a vacancy between Ski Roundtop's parcels of real property based upon the Brawners' survey of a parcel of land to which they had no title?

  II.  Did the lower court err in failing to grant partial summary judgment when the Brawners made no claim of adverse possession against Ski Roundtop or its predecessors in title?

III.  Was the lower court's decision that a gap existed between Ski Roundtop's parcels of real property clearly erroneous, when as a matter of law the metes and bounds descriptions required that said parcels adjoin each other?

IV.  Did the lower court abuse its discretion in denying Ski Roundtop's motion for a new trial when it failed to observe the presentation of evidence during trial?

## *Cross–Appeal*

   I.  Did the trial court err in denying the Brawners' Motion to Alter or Amend the Judgment so as to reflect a declaration of the rights of the parties to Pleasant View?

  II.  Did the trial court err in denying the Brawners' Motion for a Summary Judgment that the calls in Ski Roundtop's chain of title to Pleasant View establish the location and existence of same?

---

treatment of the issues, we think the court answered such question in the negative.

*Brawners' Record Title*

Preliminarily, we note that the Brawners do not contest the court's conclusion, manifested in its granting of partial summary judgment for Ski Roundtop, that they do not hold record title to any of the land in question. The court order, not appealed, stated that Andrew Smith, the Brawners' original predecessor in title, never completed the patent process necessary for the issuance of land from the State to a private interest. In fact, it appears that Smith withdrew monies transferred to the State in contemplation of the transfer of land. (contended in Appellant's Brief, p. 7, and never controverted).

■ Although the case law in this area is sparse, it appears that a requisite for valid title to real property is an original conveyance of public land by the State. *See* 3 American Law of Property, § 12:16 (1952); 73B C.J.S., *Public Lands*, § 188 (1983); 2 *Patton on Titles*, § 281 (2d ed. 1957). Absent such a conveyance, one purporting to transfer an ownership interest in such property transfers nothing, and no quantity of successive transfers by deed nor the mere passage of time will metamorphose good title from void title. Simply put, the Brawners' admission that a patent was never issued to their predecessor vitiates their assertion of record title.

■ Logically, it must follow that to the extent the Brawners attempt to rely on calls to Pleasant View in Ski Roundtop's chain of title as establishing record title, any mistaken call to the property of another, the ownership of which is asserted by way of void deed, will not establish the existence of said property. Consequently, the Brawners' contention in their cross-appeal that the trial court erred "in denying [their] Motion for a Summary Judgment that the calls in Ski Roundtop's chain of title to Pleasant View establish the location and existence of same" must fail.

■ To the extent the Brawners rely on such calls in cross-appeal Issue II as evidence that a gap exists between Ski Roundtop's properties, we hold that the sole controlling

focus should be whether the boundaries of the original patents establish the existence of Pleasant View. These patents precede any of the deeds referred to by the Brawners. Any discussion of subsequent deeds is irrelevant. In the absence of facts giving rise to an estoppel, we decline to establish a rule of law that binds successors to real property to all descriptions of property made by their predecessors in prior deeds, particularly where the original patent contradicts such deeds. Moreover, one purporting to be an adjoining land-owner should not be allowed to capitalize on such mistakes where the boundaries are correctly established by even earlier deeds or, in this case, earlier patents. Although the Brawners do not possess record title to the property in question, the remaining adverse possession claim compels us to review the trial court's decision that a vacancy exists between the Brawner's properties.

### Pleasant View Vacancy

In Issue III, Ski Roundtop argues that the trial court was clearly erroneous in its determination that a vacancy exists between Carolina's southern boundary and Nigh Nicking's northern boundary. Further, Ski Roundtop contends that as a matter of law the calls to Carricks Chance in both the Nigh Nicking patent and the Carolina patent establish that the boundaries to the two patents are the same and, consequently, no gap exists.

Although Ski Roundtop presents two different standards of review for the same court determination, it was correct in its initial inclination that our review of the trial court's fact-finding is limited to a clearly erroneous standard. The problem is not with the trial court's fact-finding, however; it arises from the court's application of the law to the facts.

Effectuation of the intent of the original parties, agreement, or surveyor, as the case may be, is of paramount consideration in boundary dispute cases. *See Wood v. Hildebrand,* 185 Md. 56, 60, 42 A.2d 919 (1945); *Md. Construction Co. v. Kuper,* 90 Md. 529, 548, 45 A. 197

(1900). The trial court's determination came down to an examination of two conflicting modern surveys of the original patents. Determination of which one of the two surveys best effects the true boundaries of the disputed land as intended by the original surveyor is a question of fact. *Zawatsky Constr. Co. v. Feldman Development Corp.*, 203 Md. 182, 187, 100 A.2d 269 (1953); *Dundalk Holding Co. v. Easter*, 195 Md. 488, 495, 73 A.2d 877 (1950). The court below found as a matter of fact that the intent of Samuel Duvall, the original surveyor, was "to join Nigh Nicking and Carolina." [4]

---

4. The most obvious evidence of Duvall's intent is his surveys of Nigh Nicking and Carolina, approximately one year apart where, as part of the land description of each, he called to the same lines of Carricks Chance. The critical language in the land patent for Nigh Nicking is as follows:

North seven degrees East forty perches to intersect the given line of the Resurvey of Carrick's Chance One of the Patents originals Thence with said Land reversed 8 courses, South seventy-three degrees West, nineteen perches, North eighty perches, North seventy-seven Degrees, West eighty perches North Twenty–Six degrees West Ninety–Four perches, South Seventy–Seven Degrees East forty perches [Nigh Nicking's 26th line] South Eighty–Eight degrees East forty perches [Nigh Nicking's 27th line], South Sixty–Six degrees East eighty perches [Nigh Nickings' 28th line] North Seventy–Two degrees East eighty-seven perches [Nigh Nicking's 29th line] to Intersect the Eighth line of a tract of land called 'The Resurvey on Black Walnut Bottom,' thence running with said Land three Courses South one and a half degrees East eleven and one half perches. . . .

(Ski Roundtop's Trial Exhibit 4). The important language in the Carolina land patent is as follows:

to a Stone Heap by a marked Chestnut Oak at the end of the thirty-first line of 'The Resurvey on Carrick's Chance,' resurveyed for Samuel Carrick on the twenty-sixth day of August, seventeen hundred and seventy-five, Then with said line reversed four courses South seventy-seven degrees East forty perches [Carolina's 87th line], South eighty-eight degrees East forty perches [Carolina's 88th line], South sixty-six degrees East eighty perches [Carolina's 89th line], North seventy-two degrees East eighty-seven perches [Carolina's 90th line] to intersect the eighth line of The Resurvey of Black Walnut Bottom, granted William Elder the tenth day of August, seventeen hundred fifty-three, as lately surveyed with one degree and a half degree allowance for Variation, thence with said line reversed, North one and a half degrees West twenty-four perches, to intersect the eleventh line of a tract of land called 'Shield's Delight,' granted William Shields the twenty-ninth day of Septem-

█ Once the intent of the original surveyor is established, absent a finding of a patent mistake on the part of the original parties of such magnitude to vitiate the original intent, *see e.g., Laflin Borough v. Yatesville Borough*, 54 Pa.Cmwlth. 566, 422 A.2d 1186 (1980) (surveyor's original intent not effectuated due to an "erroneous assumption that Yatesville then extended to that dividing line between lots"), the trial court is bound by its factfinding to apply general rules of boundary law to effectuate the original intent as found by the court. Of course, most boundary disputes evolve from surveying mistakes or ambiguous deeds. The fact that one surveyor's interpretation of the original survey results in a tidier or neater package, however, does not suffice, of itself, to override the intent of the original surveyor. A mistake of the magnitude that would justify the trial court's non-implementation of the original surveyor's intent was not found here.

█ As a general canon of boundary law, it is well-settled that a call to an adjoining boundary takes precedence over a metes and bounds description in the same instrument. *Wood, supra*, 185 Md. at 60–61, 42 A.2d 919; *Hill v. McConnell*, 106 Md. 574, 578–79, 68 A. 199 (1907). *See also* 4 Tiffany, *Real Property*, § 994 at p. 198 (3rd ed. 1975). The lower court's nebulous ruling that the Brawners' surveyor "has made a better analysis" with his "reverse tracing" of the metes and bounds description in the original patent is squarely contradictory to the court's factual findings of intent and the above canon of boundary law.[5] To

---

ber, seventeen hundred sixty-two as lately surveyed with one and half degrees allowance for Variance, then with said line.

$\cdot\quad\cdot\quad\cdot\quad\cdot$

(Plaintiff's Trial Exhibit 7).

5. In pertinent part, we excerpt the trial court's opinion:
   It seems to me that the significance is shown by this testimony of the two surveyors, at least in my mind. One, that Mr. Tydings was drawing his line from a point eleven and a half perches north, and where it met the eleventh line of Shields Delight, while Mr. Gauss plotted Carolina from the north where it met Black Walnut Bottom

the extent the call to an adjoining boundary causes Carolina to "foul" other pre-existing boundaries, the metes and bounds description gives way. We hold that the trial court erred in ruling that a gap between the patents of Carolina and Nigh Nicking existed.

### Adverse Possession

The Brawners' alternative claim to the property is based on adverse possession. On cross-appeal, they assign as error the trial court's denial of their motion to alter or amend its decision to refuse to consider whether title was vested in them by way of adverse possession. *See* cross-ap-

---

and followed it south until it again met Black Walnut Bottom. And by his determination, that is, Mr. Gauss', he left a gap of approximately ten perches which he describes as being the gap in the adjoining lines determined by Mr. Tydings, and which he determines to be the property known as Pleasant View.

In determining who is correct, it appears to me that Mr. Gauss has made a better analysis. He joins Black Walnut Bottom in two locations, is able to accomodate all of the lines on the property with Black Walnut Bottom and following down Shields Delight and again meeting, without having the overlay or overlap shown by Mr. Tydings.

. . . . .

In determining the significance of the calls, it appears to me that Samuel Duvall attempted to join Nigh Nicking and Carolina, and that was clearly his intent. As indicated, the lines have the same calls and distances, and it was clearly intended—which would clearly indicate that they were intended to join. You know, by whatever reason, they did not join, as I indicated in the argument last week or the week before, it seems to me that you can have parallel lines approximately ten perches apart, having the same calls and distances, and that they can still be in fact parallel lines.

And the plaintiff places stress on the fact that Samuel Duvall was the one who had surveyed both of the patents, but it would indicate to me that Samuel Duvall perhaps made one mistake and stuck with it, and used the calls to Carrick's Chance to indicate that he felt that the lines were a common line, when in fact, as I indicate, I find that they are not a common line but they do lie apart, as found by Mr. Gauss in his survey.

As I indicate and as I have said, I find by a preponderance of the evidence that the plotting that Mr. Gauss made from two points with respect to Carolina, from two points on Black Walnut Bottom, without leaving the unexplained extension of the ninety-first line of Carolina, would indicate that Pleasant View does in fact exist.

peal Issue II. The basis of the trial court's decision was the court's belief that the Brawners should have asserted such a claim as a counter-claim, not as an affirmative defense. Ski Roundtop counters that the Brawners' post-judgment motion to alter or amend judgment under Maryland Rule 2–534 was untimely filed.[6]

Under Maryland Rule 2–534, a motion to alter or amend judgment must be made within ten days after entry of judgment.[7]

In this case, although the motion was filed after the ten-day period, it was filed prior to the expiration of thirty days. It is also evident from the excerpt of the transcript provided in Ski Roundtop's reply brief that the court examined the merits of the motion, although it considered the filing of the motion to be untimely. We too will consider the merits of the Brawners' arguments, on the basis that the court erred in its original judgment in declining to rule on the adverse possession claim.

The Brawners argue that the court erred in two respects. First, they contend that the court, in refusing to resolve said argument, erred by failing to treat their adverse possession argument as a counter-claim. Secondly, they contend that the trial court erred in holding at the hearing on their motion to alter or amend judgment that failure to give

---

6. The court entered its judgment on March 2, 1988. Within ten days thereafter, on March 11, 1988, Ski Roundtop filed a "Motion to Alter or Amend Judgment and for a New Trial." Ski Roundtop's motion tolled the time for the filing of an appeal. The motion we are now considering was filed by the Brawners on March 28, 1988 and entered on the docket as follows: "Defendant's Answer to Motion to Alter or Amend Judgment and for a New Trial and Defendant's Counter Motion to Alter or Amend Judgment...."

7. Under Rule 2–535, however, a trial court retains revisory powers for thirty days after entry of judgment and "may take any action that it could have taken under Rule 2–534." For the purpose of tolling the thirty-day time in which an appeal must be filed, a Rule 2–535 motion is treated the same as one filed under Rule 2–534 where it is filed within ten days after judgment. *B & K Rentals & Sales Co. v. Universal Leaf Tobacco Co.,* 73 Md.App. 530, 535, 535 A.2d 492 (1988); *Sieck v. Sieck,* 66 Md.App. 37, 44, 502 A.2d 528 (1986).

notice to adjoining landowners precluded determination of their claim.

The Brawners' adverse possession claim was styled in the form of an affirmative defense. Under Maryland Rule 2–323(g), "[w]hen a party has mistakenly designated a defense as a counterclaim or a counterclaim as a defense, the court shall treat the pleading as if there had been a proper designation, if justice so requires." Justice required such action here; thus, we think the lower court erred in ruling that the styling of the claim precluded its resolution of the claim.

The lower court also apparently indicated that § 10–909 of the Courts and Judicial Proceedings article of the Maryland Code required that the Brawners give notice to adjoining landowners of their adverse possession claim. That provision does not even remotely contain such a notice requirement. An action to quiet title and, in this case, a counter-claim for adverse possession are proceedings *in rem* or quasi *in rem. See* Md. Real Prop.Code, § 14–108(b) (1988). As such, the notice requirements are contained within Maryland Rule 2–122. That rule imposes certain notice requirements on the *plaintiff* in such an action "where the whereabouts of the defendant are unknown." The rule does allow the court to "order any other means of notice that it deems appropriate in the circumstances," Md.Rule 2–122(a), but the record on appeal does not reveal any such court action. We hold that the Brawners were not required by statute or any other authority to give notice to surrounding landowners.[8] In view of our reversal on the issue of whether a gap exists between Ski Roundtop's

8. Our holding should not be construed to limit any duties that may arise under Rule 2–211, the necessary joinder rule. Neither party contends, nor did the court find, that a necessary party had not been joined under this rule. Even on appeal, this is not contended. *Cf. Bodnar v. Brinsfield,* 60 Md.App. 524, 483 A.2d 1290 (1984) (failure to join a necessary party could be raised on appeal).

properties, on remand the trial court should determine the Brawners' adverse possession claim.[9]

In regard to the claim in appeal Issue II that "the lower court erred in failing to grant partial summary judgment when the Brawners made no claim of adverse possession against Ski Roundtop or its predecessors in title, Ski Roundtop's arguments are without merit. First, it contends that the trial court erred in allowing the Brawners to amend their answers to interrogatories to assert that they claimed adverse possession against Ski Roundtop, the State of Maryland and the whole world. Ski Roundtop does not refer to any cases to support its position that the lower court's action in granting the Brawners' leave to amend was an abuse of discretion. In fact, "[w]ith leave of court and upon such terms as the court may impose, any motion or other paper may be amended." Md.Rule 2–342. The broad brush of such language and the general liberal construction our courts have imposed on the allowance of amendments to pleadings indicate that not only did the lower court properly exercise its discretion in allowing amendment to the answers to interrogatories, it would most likely have been an abuse of discretion not to allow such an amendment. *Cf. Crowe v. Houseworth,* 272 Md. 481, 325 A.2d 592 (1974); *Development Sales Co. v. McWilliams,* 254 Md. 673, 255 A.2d 1 (1969) (construing former Rule 610, predecessor to current summary judgment rule); *Jacobson v. Julian,* 246 Md. 549, 229 A.2d 108 (1967) (same).

Ski Roundtop's second argument presents the same ground that the trial court later utilized in refusing to construe the Brawners' adverse possession claim as a properly pled counter-claim. Our resolution of that issue earlier in this opinion is dispositive here.

---

**9.** Had a gap existed between Ski Roundtop's properties, the logical inference would be that the ownership of the unpatented land remained in the State. In that case, the court would not have erred in refusing to determine the Brawners' adverse possession claim because the State, as record title owner, would have been a necessary party to the action.

Finally, Ski Roundtop contends that the Brawners did not prove at trial that they possessed good title by way of adverse possession. We fail to see the relevance of this argument to the issue of whether the trial court erred in refusing to grant Ski Roundtop's motion for summary judgment. Ski Roundtop did not include a copy of its motion for summary judgment in the record on appeal; we do not know whether sufficiency of the evidence was a ground upon which it relied in bringing the motion. Therefore, the trial court did not err in refusing to grant summary judgment on the adverse possession claim.[10]

In view of the fact that we have held that the trial court was clearly erroneous in ruling that a vacancy exists between Ski Roundtop's properties, we need not determine whether it abused its discretion by refusing to grant a new trial on the basis that the court's view of the evidence during a portion of the trial was obscured. *See* Issue IV. This evidence related to the aspect of the trial regarding record ownership of the disputed land, an issue which has been resolved in Ski Roundtop's favor.

## CONCLUSION

As a matter of law, the Brawners do not possess record title to the disputed land as such title has been asserted pursuant to an unissued land patent. Further, the trial court was clearly erroneous in finding that a gap exists between Ski Roundtop's properties that could be the subject of such a patent. As a consequence, Ski Roundtop possesses record title to the property. The trial court erred in refusing to determine the Brawners' adverse possession claim. On remand, the court shall make a factual determi-

---

10. To the extent Ski Roundtop attempts to present additional argument on this issue in its reply brief, we refuse to consider it. *St. Luke Church v. Smith,* 74 Md.App. 353, 374 n. 12, 537 A.2d 1196 (1988); *Berkson v. Berryman,* 63 Md.App. 134, 140–41, 492 A.2d 338, *cert. denied,* 304 Md. 296, 498 A.2d 1183 (1985); *Federal Land Bank v. Esham,* 43 Md.App. 446, 459, 406 A.2d 928 (1979).

nation as to this aspect of the case based on the evidence already before it.

JUDGMENT REVERSED; CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ONE–HALF THE COSTS TO BE PAID BY APPELLANT. ONE–HALF THE COSTS TO BE APPORTIONED AMONG THE APPELLEES.